UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                      No. 04-CR-80844

vs.                                          Hon. Gerald E. Rosen

PHILLIP ZABAWA,

                Defendant.
_____/

FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
COUNT ONE OF INDICTMENT CHARGING DEFENDANT PHILLIP ZABAWA
WITH ASSAULTING, RESISTING AND IMPEDING A FEDERAL OFFICER

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on       November 23, 2010

PRESENT:   Honorable Gerald E. Rosen
                      United States District Chief Judge

I. INTRODUCTION

Defendant Phillip Zabawa is charged in an October 13, 2004 Indictment with a single count of assaulting, resisting, opposing, intimidating, impeding and interfering with a federal officer, in violation of 18 U.S.C. § 111(a)(1) and (b). Defendant has waived his right to a trial by jury, and instead requested a trial by the Court on all issues of fact and law arising from the charge against him.

Accordingly, on August 30, August 31, and September 1, 2010, the Court conducted a bench trial on the charged offense. During the course of this proceeding, the

1

Court heard the testimony of five witnesses called by the Government: (i) U.S. Deputy Marshal Matthew Batcheller, (ii) Detention Enforcement Officer Gregory Shelton, (iii) U.S. Deputy Marshal Denis Donovan, (iv) U.S. Deputy Marshal David Murphy, and (v) Supervising U.S. Deputy Marshal Mark Jankowski. In addition, the Government introduced a number of exhibits for the Court's consideration. The defense elected not to call any witnesses. After the close of proofs, Defendant moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. The Court ordered supplemental briefing on the Rule 29 motion and took the matter under advisement.

Having reviewed and considered the testimony and exhibits offered during the three-day bench trial, the oral arguments of counsel, and the parties' post-trial briefs,[1] and having also reviewed the applicable statutes and case law, the Court is now prepared to decide the issues of fact and law raised during the trial and in Defendant's Rule 29 motion, and to resolve the overarching question presented: namely, whether the Government has proven Defendant guilty of the charged offense beyond a reasonable doubt. This Opinion and Order sets forth the Court's findings of fact and conclusions of law on these matters. To the extent that any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute

---

[1] The Government moved to strike Defendant's Brief because it was not filed simultaneously with the Government's brief, as contemplated by the Court, and was instead filed as a "Response" to the Government's brief. The Government included within its brief in support of its motion to strike its own "response" to Defendant's brief. Because the Court has considered the Government's response, the Government has not been prejudiced and the Court, therefore, declines to strike the Defendant's Brief.

findings of fact, they are so adopted.

## II. FINDINGS OF FACT

On December 2, 2003 at approximately 7:45 a.m., Defendant Phillip Zabawa was transported from the Wayne County Jail to the U.S. Marshal's lock-up facility in the Theodore Levin U.S. Courthouse for a sentencing hearing scheduled on that day before United States District Judge Avern Cohn. According to Detention Enforcement Officer ("DEO") Gregory Shelton, when Zabawa arrived at the lock-up, he seemed to be a little "disgruntled and upset." [8/30/10 Tr. p. 70.] After being searched, Zabawa was sent down the cell block hallway to his cell[2] and directed by DEO Shelton to close the cell door behind him. Zabawa refused to comply with that directive, complaining that "he'd been locked up for 15 years and the last thing he was going to do was close his own cell door." [8/30/10 Tr., pp. 70-72.]

Because it was apparent to DEO Shelton that Zabawa was upset, he had Zabawa come back down the hall and placed him in Interview Room 14 so the detention officers could ascertain out what was going on with him. *Id.* at 72. As was explained during the trial, it is standard practice in the lock-up to separate noncompliant prisoners from the other prisoners. [*See* 8/30/10 Tr., testimony of David Murphy, pp. 130-31.] Hence, Zabawa was removed from the cell block and placed in Interview Room 14.

---

[2] Zabawa was the fourth prisoner processed that morning and, accordingly, was directed to the fourth cell down the hall.

Interview Room 14 is a small room, only 5 feet by 9 feet in size. [8/30/10 Tr., p. 133]. Shelton called DEO David Murphy, the most senior Detention Enforcement Officer on duty that day,[3] to advise him that there was a problem with a non-compliant prisoner. Murphy, at the time, was just finishing up his morning workout in the Marshal's gym. *Id.* at 125.

Murphy contacted his supervisor, Supervising U.S. Deputy Marshal Mark Jankowski, to apprise him of the situation, and then went to the lock-up facility himself. After a three to four-minute briefing by DEOs Marcus Williams and Gregory Shelton, Murphy went to the Interview Room to try to calm Zabawa down.

Murphy testified that as he approached Interview Room 14, he observed Zabawa seated on a stool with his arms on his knees, looking at the floor. [8/30/10 Tr. pp. 129-132.] According to Murphy, Zabawa appeared to be agitated. *Id.* at 131. Murphy testified that he stood in the doorway of the Interview Room and calmly asked Zabawa what the problem was. Murphy testified that as soon as he asked this, Zabawa exploded. *Id.* at 134. Zabawa told Murphy that he was tired of "being moved all over the place." *Id.* Murphy tried to explain to Zabawa that he had been brought to the U.S. Courthouse lock-up because he had a court appearance that day; that the detention officers had nothing to do with it. *Id.* at 134-35. Zabawa responded, "[Y]ou're wearing a badge. You have everything to do with it," *id.*, at 135, and then proceeded to complain to

---

[3] Murphy was, at the time, a Detention Enforcement Officer. In 2004, Murphy became a Deputy Marshal.

4

Murphy how he "couldn't do this and that." *Id.*

At the end of his tirade, Zabawa told Murphy that if he ever got a gun, he would be sure to use it. *Id.* at 136. Murphy testified that he responded, "You're not going to get one here," to which Zabawa, looking directly at Murphy, growled, "Don't bet on it." *Id.* at 139-41.

Murphy testified that when Zabawa started talking about guns, he feared Zabawa would try to disarm one of the deputies, so he decided that instead of continuing to try to reason with Zabawa, he had to exert his authority. He told Zabawa if he continued to give the deputies and DEOs a problem, they would have to put him in full restraints and take him back to Wayne County Jail. *Id.* at 141. Intending to handcuff Zabawa, Murphy ordered Zabawa to stand up and turn around. *Id.* Zabawa refused to comply. *Id.* Murphy repeated his directive, telling Zabawa, "I'm not scared of you. I know you're not scared of me, but you're going to comply with officers' orders." *Id.* at 143. Zabawa told Murphy, "If you were [here] alone, you'd be scared." *Id.* at 145. Murphy asked Zabawa whether he was threatening him, to which Zabawa responded, "If I was in your face I'd be threatening you." *Id.*

Zabawa had remained seated during this exchange but began tapping his feet quickly and his eyes were darting around. *Id.* at 148. Murphy testified he intended to get Zabawa on his feet and turn him around to get handcuffs on him. Because the space was so small, he told DEO Shelton, who was observing from an area to the left of the

5

doorway just outside the room to step back. *Id.* at 146. As soon as Murphy told Shelton to "step back," Zabawa "lunged" at him, *id.*, i.e., he came up from a seated position with a closed fist coming towards Murphy. *Id.* at 147-149.

Murphy moved to block Zabawa's arm movement with a clinch move which prevented Zabawa from forcibly driving on through the doorway and out of the Interview Room. *Id.* at 149, 159. Blows were exchanged and a violent struggle ensued. *Id.* at 149-50, 165. Shelton testified that he observed Zabawa and Murphy "exchanging punches." *Id.* at 79-80. A duress alarm was sounded in the U.S. Marshal's offices on the third floor. Deputy Marshal Denis Donovan was the first to respond to the duress alarm. Donovan testified that when he arrived on the scene, he saw Murphy struggling with Zabawa to get him under control and observed Zabawa punching Murphy with closed fists. 8/30/10 Tr., pp. 108-09. Donovan then grabbed Zabawa and attempted to push him to the ground. *Id.* at 106.

Supervising Deputy Marshal Jankowski arrived a few moments behind USDM Donovan. He observed Donovan, Murphy and DEO Williams struggling with Zabawa who continued to fight and struggle with the officers until he was finally handcuffed. 8/30/10 Tr., p. 110; 8/31/10 Tr., p. 196.]

Jankowski contacted Deputy Marshal Batcheller, and Batcheller arrived in the lock-up after Zabawa had been restrained. 8/30/10 Tr., p. 38. Batcheller testified that he observed DEO Murphy "bleeding profusely from the head." *Id.* at 41-44. DEO Shelton

6

described Murphy's cut as "a bleeding cut, pretty good size gash above one of his eyes." *Id.* at 83. Deputy Marshals Donovan and Jankowski testified that there was blood on the floor and on the wall of the door to the interview room, and there was blood all down Murphy's shirt. 8/30/10 Tr., p. 114; 8/31/10 Tr., p. 25.

Deputy Marshal Batcheller escorted Murphy first to the nurse's station on the tenth floor of the courthouse, and then, because the cut above Murphy's eye was deep and required stitches, he escorted Murphy to the emergency room at Detroit Receiving Hospital. 8/30/10 Tr., pp. 41-44. In addition to the cut above his eye, as a result of the struggle with Zabawa, Murphy suffered a bruised knee and, scratches on his neck, and cuts and scrapes on his hands. 9/1/10 Tr., pp. 19-20; 24.

Due to the fast moving nature of the struggle, however, Murphy could not recall with specificity how he got the cut above his eye. He testified that he intercepted Zabawa's blows but does not know if he got the cut from Zabawa's punches or if he got it from head-butting Zabawa. *See* 8/30/10 Tr. pp. 158-171. When questioned about head-butting Zabawa, Murphy testified that in the fast-moving scuffle, he threw an elbow, threw a knee, and head-butted Zabawa, explaining, "Whenever I had an opening, I used that opening to do what I could to put him on the floor." *Id*. at 161. Murphy further testified that he had no injuries prior to entering the Interview Room and that after Zabawa lunged at him, he and Zabawa never broke contact until Zabawa was restrained and handcuffed. *Id.* at 26.

7

On October 13, 2010, Zabawa was indicted on one count of assaulting, resisting, opposing, intimidating, impeding and interfering with a federal officer, in violation of 18 U.S.C. § 111(a)(1) and (b). The indictment charges that:

> On or about December 2, 2003, in the Eastern District of Michigan, Southern Division, and elsewhere, the defendant, PHILLIP ZABAWA, knowingly did forcibly assault, resist, oppose, impede, intimidate and interfere with David Murphy, a Deputy Detention Enforcement Officer employed by the United States Marshal Service, and did cause David Murphy to suffer bodily injury, to wit: a laceration to the face, while David Murphy was engaged in his official duties; in violation of Title 18, United States Code, Section 111(a)(1) and (b).

### III. CONCLUSIONS OF LAW

The Court notes, as an initial matter, that it must apply the version of 18 U.S.C. § 111 in effect at the time of the conduct underlying the charged offense occurred. *See United States v. McNaught,* 2010 WL 4070059 at *1 (2d Cir., Oct. 19, 2010); *United States v. Perea*, ___ F. Supp. 2d ___, 2010 WL 2292997 (D.N.M. 2010). At the time of the offense in question, § 111 provided, in relevant part:

> (a) In general.--Whoever--
>
> (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114[4] of this title while engaged in or on account of the performance of official duties. . .
>
> * * *

---

[4] The persons designated in Section 1114 include "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services)." 18 U.S.C. § 1114.

8

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and in all other cases,[5] be fined under this title or imprisoned not more than 8 years, or both.

(b) Enhanced penalty.--Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111 (effective November 2, 2002 to January 6, 2008).

In enacting § 111, Congress intended broadly to prohibit harm or threats of harm to certain federal officials, as well as to deter interference with their law enforcement activities. *See United States v. Feola*, 420 U.S. 671, 678-84, 95 S.Ct. 1255 (1975).

Courts generally agree that § 111 creates three distinct categories of conduct: (1) simple assault, which, in accord with the common-law definition, does not involve touching; (2) 'all other cases,' meaning assault that does involve contact[6] but does not result in bodily injury or involve a weapon; and (3) assaults resulting in bodily injury or

---

[5] Section 111 was amended on January 7, 2008, replacing the "in all other cases" language with "where such acts involve physical contact with the victim of that assault or the intent to commit another felony." *See* Pub.L. 110-177, Title II, § 208(b), 121 Stat. 2538.

[6] As noted above, Section 111 was amended in 2008, and pursuant to the amendment, an offense under this second category can now be established either by proof of physical contact with the victim or by proof of "intent to commit another felony." *See* Pub.L. 110-177, Title II, § 208(b), 121 Stat. 2538.

9

involving a weapon. *See United States v. Gagnon*, 553 F.3d 1021, 1024 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 115 (2009); *United States v. Vallery*, 437 F.3d 626, 630 (7th Cir. 2006); *United States v. Hathaway*, 318 F.3d 1001, 1006-1008 (10th Cir. 2003); *United States v. Yates*, 304 F.3d 818, 821-22 (8th Cir. 2002), *cert. denied*, 538 U.S. 909 (2003); *United States v. Campbell*, 259 F.3d 293, 296 (4th Cir.2001); *United States v. McCulligan*, 256 F.3d 97, 102 (3d Cir.2001); *United States v. Ramirez*, 233 F.3d 318, 321-22 (5th Cir.2000); *United States v. Chestaro*, 197 F.3d 600, 606 (2d Cir.1999) *cert. denied*, 530 U.S. 1245 (2000). The Government here has charged Defendant Zabawa under the third category which, as indicated, pursuant to 18 U.S.C. § 111(b), carries an enhanced penalty for "infliction of bodily injury".

To support a conviction for violation of 18 U.S.C. §§ 111(a) and (b), the Government must prove the following elements: (1) that Defendant forcibly assaulted (or resisted, opposed, impeded, intimidated, or interfered with) David Murphy; (2) that David Murphy was a federal officer who was, at the time, engaged in the performance of his official duties; (3) that Defendant did so intentionally; and (4) that in doing such acts, Defendant inflicted bodily injury upon Murphy. *See United States v. Ferrante*, 502 F. Supp. 2d 502, 505 (W.D. Tex. 2006); *see also United States v. Robinson*, 86 Fed. Appx. 820, 821, 2003 WL 2315637 at *1 (6th Cir. 2003) (unpublished decision).

The Court finds that the evidence presented at trial establishes, beyond a

reasonable doubt, that Defendant Zabawa forcibly and intentionally assaulted, resisted, opposed, impeded, intimidated and interfered with David Murphy on December 2, 2003 while Murphy was engaged in the performance of his official duties as a Detention Enforcement Officer.  As Murphy testified, the primary responsibility of the DEOs is dealing with prisoners and handling the security of the lockup facility.  Murphy was on duty on December 2, 2003 when, as the most senior DEO on duty, was called upon to deal with Defendant Zabawa who was being non-compliant. Murphy testified that after his attempts to reason with Zabawa had failed, Zabawa "lunged" at him.  According to Murphy, Zabawa came up from a seated position with a closed fist coming towards Murphy.  8/30/10 Tr. pp. 147-149.  As soon as Murphy saw Zabawa's movement, he moved to block Zabawa from driving through the doorway.  *Id.* at 149-50. Murphy testified his whole objective was to put Zabawa on the floor but Zabawa kept struggling with him.  *Id.*  DEO Shelton testified that he observed Zabawa and Murphy "exchanging punches."  *Id.*  at 79-80.  Deputy Marshal Donovan also testified that he saw Murphy struggling with Zabawa, and observed Zabawa swinging with his hands and punching Murphy with closed fists.  *Id.* at 108-109. The Court fully credits Murphy's, Shelton's and Donovan's testimony. The evidence also establishes that DEO Murphy suffered physical injuries, specifically, a laceration on his face over his eye which required emergency medical attention and sutures, as well as a bruised knee and, scratches on his

11

neck, and cuts and scrapes on his hands.

Defendant Zabawa, however, contends that insufficient evidence was presented at trial to establish that he "inflicted" bodily injury on Murphy. In his Rule 29 motion, Zabawa argues that the term "inflicts" as used in § 111(b) must be narrowly construed and requires a showing that the Defendant actually inflicted the particular injury set forth in the indictment. The indictment here charges Zabawa based only the laceration on Murphy's face. Because neither Murphy nor any of the other witnesses was able to testify exactly how Murphy got the cut above his eye, Zabawa claims that the Government has failed to make out the required showing to sustain a conviction on the 20-year offense set forth in Section 111(b).

As set forth above, Murphy testified that he had no injuries prior to entering the Interview Room. He also testified that the altercation was initiated by Zabawa lunging at him. Murphy further testified that he and Zabawa never broke physical contact thereafter until Zabawa was finally restrained and handcuffed by Deputy Marshal Donovan. Murphy testified that during the melée, he intercepted Zabawa's blows but he did not know if he got the cut above his eye from Zabawa's punches or if he got it from head-butting Zabawa during the scuffle.

According to Defendant, however, this showing that Murphy's laceration occurred as a result of the melée initiated by Zabawa is insufficient. Defendant's position is that

evidence that Zabawa actually inflicted the laceration is required.

A similar argument was rejected by the court in *United States v. Garcia-Camacho*, 122 F.3d 1265 (9th Cir. 1997). In that case, the defendant and his girlfriend were confronted by a United States Border Patrol agent after they had jumped the international boundary fence between the United States and Mexico. After the Border Patrol agent determined that they were citizens of Mexico, he directed the couple to walk to his nearby border-patrol vehicle. The agent followed a few feet behind them as they walked up a steep incline when suddenly the defendant yelled "run, run" in Spanish to his girlfriend. *Id.* at 1267. The Border Patrol agent testified that immediately following defendant's yelling "run, run," the defendant lunged and attacked him. *Id.* The agent was trying to put him down on the ground, and during the struggle, his ankle was severely broken. *Id.* The agent and the defendant remained locked in close combat until another agent arrived on the scene and was able to subdue the defendant. *Id.*

Garcia was subsequently charged with assaulting a federal officer in violation of 18 U.S.C. § 111. *Id.* at After pleading guilty, he was sentenced pursuant to the enhanced penalty provision set forth in Section 111(b). He thereafter appealed his sentence arguing that the district court erred in applying § 111(b)'s enhanced penalty provision because he did not "inflict" or "directly cause" the Border Patrol agent's bodily injury. (He also argued that the district court erred in applying the "aggravated assault" sentencing

13

guideline, U.S.S.G. § 2A2.2, for assaults involving serious bodily injury.)

The Ninth Circuit rejected the narrow construction advanced by Garcia. *Id.* at 1269. The court's reasoning with respect to both his Section 111 and Sentencing Guideline arguments is instructive:

> Appellant . . . argues that his conduct did not involve serious bodily injury, pursuant to section 2A2.2 because Agent Manen's injury was not the "direct result" of the Appellant's conduct.
>
> * * *
>
> Although Appellant cites no case law supporting this interpretation, . . . he makes a valid point that there may be circumstances where an injury is so attenuated that a defendant should not be held accountable. For example, if Agent Manen had tripped and twisted his ankle while walking a handcuffed and subdued Appellant back to the patrol car, then perhaps Appellant should not be held accountable for that injury.
>
> However, . . . [h]ere, Agent Manen was engaged in a struggle with the Appellant at the time he broke his ankle. The district court found that the injury was a "result of that combat.". . .
>
> Appellant nevertheless contends that "[t]he injury incurred was a direct result of the agent's conduct, not that of Mr. Garcia." He attempts to divide the episode into two separate events: first, Appellant's lunge; second the agent's efforts to arrest Appellant. This scenario contradicts the district court's factual findings. The evidence does not support Appellant's theory that he was subdued and no longer struggling at the time of the agent's injury. Agent Manen's testimony clearly indicated that the struggle continued until another agent arrived and placed Appellant in handcuffs. Appellant presents no evidence that the district court's factual findings are clearly erroneous. Moreover, by distinguishing between the conduct he initiated (the initial struggle) and the conduct the agent initiated (the arrest), Appellant artificially attempts to turn a continuous action into a series of separate events.

> . . . In speculating that "the exact same injury could have resulted from physical contact that was initiated by the agent during the routine arrest of any person attempting illegal entry," **Appellant ignores the fact that Agent Manen was not injured while handcuffing a passive defendant, but rather while engaged, in the district court's words, in "close locked combat." The fact that Appellant did not kick the agent's ankle or otherwise come into contact with it does not demonstrate that his behavior was not the cause of the injury.**
>
> * * *
>
> . . . Appellant's arguments against the application of section 111(b) are equally unavailing. . . . **Appellant's efforts to argue that "to inflict" means more than "to cause" similarly fail. Webster's Third New International Dictionary (1976) defines "inflict" as" "to lay (a blow) on; [to] cause (something damaging or painful) to be endured." As demonstrated above, Appellant's conduct did directly cause Agent Manen's injury. Appellant therefore did "inflict" bodily injury on Agent Manen, and the district court did not err in imposing sentence under the section 111(b) enhanced penalty provision.**

122 F.3d at 1267-69 (emphasis added).

The Seventh Circuit likewise rejected the defendant's argument in *United States v. Jackson*, 310 F.3d 554 (7th Cir. 2002). In that case, five deputy marshals went to the defendant's last known address to execute a warrant to start the process of revoking the defendant's parole. *Id.* at 555. Jackson was not there, but he arrived a short while later, and upon seeing the deputy marshals he tried to flee. An auto chase ensued until finally Jackson was trapped. *Id.* He emerged from his car and was told to put his hands over his head when, suddenly he thrust them into his pockets instead. *Id.* Viewing this as a threatening move, the marshals tackled him. Jackson squirmed and twisted while the

deputies attempted to subdue him. *Id.* During this struggle, one of the deputy marshals, Randy Scott, who tried to handcuff Jackson, tore a ligament in his right thumb. This required surgical repair. *Id.*

In response to Jackson's efforts to impede the deputy marshals, the United States filed charges under 18 U.S.C. § 111. Following a jury trial, Jackson was convicted and sentenced pursuant to the enhanced penalty provision set forth in § 111(b). *Id.* at 556.

Jackson appealed his sentence insisting that he did not "inflict" injury upon Scott. The Seventh Circuit found no merit in Jackson's argument:

> As for the question whether Jackson "inflicted" an injury on Scott: the jury was entitled to conclude that he did. Jackson contends that the word "inflict" means a deliberate plan to produce a consequence, and that an accidental harm is "caused" but not "inflicted." Sensible jurors could have concluded that Jackson *did* want to harm the deputy marshals. Escape was impossible once the officers' cars blocked Jackson's. What could have been the point of this skirmish other than a desire to hurt the captors? Jackson could not have foreseen the particular injury that occurred, but he could have foreseen (and may well have desired) that *some* harm would come to the deputy marshals. . . . Doubtless "inflict" is more restrictive than "cause"; if Jackson had not resisted, but Scott had tripped on his untied shoelaces while walking over to apply handcuffs, it would not make sense to say that Jackson had "inflicted" an injury. But **the actual injury occurred while Scott was grappling with Jackson, who applied force directly to Scott's person. This satisfies the normal understanding of "inflict."**

310 F.3d at 556-57 (some emphasis added).

Although the Sixth Circuit has not been called upon to decide the issue, it appears that our Circuit would view the issue in the same light as the Ninth and Seventh Circuits.

16

In its most recent case involving a Section 111 offense, *United States v. Gagnon*, 553 F.3d 1021 (6th Cir. 2009), though the issue presented did not precisely involve § 111(b)'s enhanced penalty provision,[7] the Court delineated the distinctions between the three categories of crimes in § 111, and, in so doing, stated that Section 111(b) applies to assaults on federal officers "that either involve a deadly or dangerous weapon or ***result in bodily injury***." *Id.* at 1025 (emphasis added).[8] *Cf., United States v. Ramirez*, 233 F.3d 318 (5th Cir. 2000) ("[U]nder 18 U.S.C. § 111, "all other cases" refers to those assaults

---

[7] The issue in *Gagnon* was the difference between "simple assault" and "all other cases" as set forth in § 111(a).

[8] This "assault that results in bodily injury" characterization is also consistent with the Model Criminal Jury Instructions adopted in several circuits. *See e.g.,* Model Crim. Jury Instr. 8th Cir. 6.18.111 (2007):

> The crime of assault on a federal officer as charged in the indictment, has four elements, which are:
>
> *One*, the defendant forcibly assaulted (*describe officer by position and name*),
>
> *Two*, the assault was done voluntarily and intentionally,
>
> *Three,* **the assault *resulted in* bodily injury**, and
>
> *Four*, at the time of the assault (*name of officer*) was doing what he was employed by the federal government to do.

(Emphasis added).

contemplated by the statute which do involve physical contact, but do not *involve* a deadly weapon or *bodily injury*." 233 F.3d at 322); *United States v. Jones*, 237 Fed. Appx. 505 (11th Cir. 2007) (discussing "all other cases" and holding that "physical contact is sufficient to elevate simple assault to forcible assault, even when that physical contact does not *result in* actual *bodily injury*." *Id.* at 508 (citing *United States v. Martinez*, 486 F.3d 1239, 1246 (11th Cir. 2007)).

In *Gagnon*, the Sixth Circuit cautioned against a "hyper-literal approach to § 111." 553 F.3d at 1026 n.5. It is a hyper-literal approach that Defendant here is advocating.

It is well-settled that, in construing a statute, a court should adopt that sense of words which best harmonizes with context and promotes the policy and objectives of the legislature. *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 396 (1868). The congressional goal in enacting Section 111 was to protect federal officers with the highest degree of certainty that those who assault a federal officer will be brought to justice. *United States v. Feola*, *supra*, 420 U.S. at 684. Guided by the above cases, the Court concludes that to fulfill this goal, the term "inflicts bodily injury" as used in subsection (b) of the statute should be interpreted more broadly than Defendant advocates.

The plain meaning of "inflict" is to "cause (something damaging or painful) to be endured". *See* Webster's Eleventh New Collegiate Dictionary (2003); *see also* the online Oxford University Press Dictionary, http://oxforddictionaries.com/view/entry/

18

m_en_us1257996#m_en_us1257996 (defining "inflict" as "to cause (something unpleasant or painful) to be suffered by; impose (something unwelcome) on").

In this case, Defendant Zabawa initiated the melée in Interview Room 14. He lunged at DEO Murphy and a violent struggle between the two ensued that did not end until other DEOs and Deputy Marshals were able to subdue Zabawa and get him handcuffed. DEO Murphy's laceration occurred while he was struggling with Zabawa, who applied force directly to Murphy's person. As the courts found in *Camacho-Garcia* and *Jackson*, this satisfies the normal understanding of "inflict." Therefore, Defendant's Fed. R. Crim. P. 29 Motion for Judgment of Acquittal is DENIED.[9]

---

[9] In light of this ruling, it is unnecessary for the Court to consider the Government's argument that the Court should be permitted to rely upon evidence concerning all of the other injuries suffered by DEO Murphy in determining whether Zabawa "inflicted" bodily injury on Murphy without creating an impermissible constructive amendment or prejudicial variance to the indictment.

## CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY FOUND by the Court, as trier of fact, that the Government has proven beyond a reasonable doubt that Defendant Phillip Zabawa is GUILTY of the offense charged in Count One of the Indictment.

                                        s/Gerald E. Rosen
                                        Chief Judge, United States District Court

Dated: November 23, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 23, 2010, by electronic and/or ordinary mail.

                                        s/Ruth A. Gunther
                                        Case Manager